**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| JACK E. FAIN, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 2:12-CV-405-PRC |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of the | ) | |
| Social Security Administration, | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Jack Eugene Fain

on October 9, 2012, and a Plaintiff's Brief in Support of Reversal of Commissioner's Final Decision

[DE 15], filed by Mr. Fain on February 26, 2013. Mr. Fain requests that the July 20, 2011 decision

of the Administrative Law Judge denying his claims for disability insurance benefits be reversed or

remanded for further proceedings. On June 4, 2013, the Commissioner filed a response, and Mr. Fain

filed a reply on July 1, 2013. For the following reasons, the Court denies Mr. Fain's request for

remand.

**PROCEDURAL BACKGROUND**

On December 11, 2008, Mr. Fain filed an application for disability insurance benefits,

alleging an onset date of November 1, 2008. The application was denied initially on April 20, 2009,

and upon reconsideration on July 27, 2009. Mr. Fain timely requested a hearing, which was held on

July 5, 2011, before Administrative Law Judge ("ALJ") Sandra R. DiMaggio Wallis. In appearance

were Mr. Fain, his attorney Thomas J. Scully III, and vocational expert ("VE") Richard T. Fisher.

The ALJ issued a written decision denying benefits on July 20, 2011. She made the following

findings:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.

2.    The claimant has not engaged in substantial gainful activity since November 1, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.    The claimant has the following severe impairments: history of torn hamstring, osteoarthritis and chronic lateral instability of the left foot and ankle with pes cavus deformity and osteoarthritis of the right knee (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift/carry up to 50 pounds occasionally and up to 25 frequently, stand/walk for six hours in an eight-hour workday, sit for six hours in an eight-hour workday. He can occasionally push/pull with his right lower extremity and must avoid concentrated exposure to wetness, vibration, machinery, and heights.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born [in 1950] and was 58 years old, which is defined as an individual of advanced age, on the alleged disability onset date (20 CFR 404.1563).

8.    The claimant has at least a high school education and is able to communicate in English (20 FR 404.1564).

9.    The claimant has acquired work skills from past relevant work (20 CFR 404.1568).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, the claimant has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy (20 CFR 404.1569, 404.1569(a) and 404.1568(d)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from November 1, 2008, through the date of this decision (20 CFR 404.1520(g)).

(AR 22-32).

On August 30, 2012, the Appeals Council denied Mr. Fain's request for review, leaving the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. § 404.981. On October 9, 2012, Mr. Fain filed this civil action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of the Agency's decision.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

## FACTS

### A. Medical Background

*1.     Physical Conditions*

On December 27, 2007, Mr. Fain was issued a pair of custom functional foot orthotic devices by podiatrist Marc Bruell, DPM. Dr. Bruell directed Mr. Fain to use supportive shoes.

After injuring himself while trying to stop a rolling truck, Mr. Fain had an x-ray image made of his right leg on November 2, 2008, because of leg pain. While the x-ray showed degenerative osteoarthritic changes involving the knee joint and gave an impression of mild early osteoarthritic changes involving the hip joint, no fracture was seen. On November 4, 2008, Mr. Ritter saw his primary care physician, Mark Ritter, M.D., for follow up of the leg injury. Dr. Ritter gave a diagnosis of a probable hamstring tear, partial. Dr. Ritter ordered an MRI, which showed evidence of a torn hamstring. On November 10, 2008, Dr. Ritter referred Mr. Fain to Thomas H. Kay M.D.,

an orthopedic surgeon. On November 12, 2008, Dr. Kay diagnosed Mr. Fain with a right hamstring tear, recommended conservative treatment, and prescribed physical therapy. He instructed Mr. Fain to follow up with him in four weeks.

In November 2008, Mr. Fain began physical therapy at the Lake Shore Bone and Joint Institute.

On December 8, 2008, Mr. Fain returned to Dr. Kay for follow up on his hamstring tear. He reported that he was doing better and had no specific complaint. He reported pain that was tolerable but was concerned that he was not yet able to return to work. Dr. Kay prescribed continued physical therapy and directed him to return for follow up in four weeks, anticipating that Mr. Fain would be able to return to work at that time.

On January 5, 2009, Dr. Kay noted that Mr. Fain was doing well, that his overall hamstring strength had improved by at least 50% but was still lacking, and that his balance had improved. Mr. Fain reported no pain. The physical examination revealed tenderness in the high hamstring area and some weakness was noted with hamstring activity. Mr. Fain's gait was awkward and antalgic. Dr. Kay ordered that Mr. Fain continue rehabilitation and directed follow up in six weeks.

On February 20, 2009, Kanayo K. Odeluga, M.D. performed a consultative physical examination of Mr. Fain for the Disability Determination Bureau. Mr. Fain presented with a complaint of torn right hamstring muscle. Mr. Fain reported some discomfort in the upper part of the thigh and described his pain as "stabbing, constant, mild to moderate in intensity and exacerbated by sitting for more than 15 minutes or walking." (AR 384). He reported that he had been doing physical therapy for four months without any significant improvement of his pain. Mr. Fain denied joint pain, swelling, or stiffness. Dr. Odeluga noted Mr. Fain's weight of 220 pounds and height of 6'1". Dr. Odeluga noted that Mr. Fain was obese with no pallor, jaundice, or cyanosis

noted. The examination of the spine and upper extremities was normal. In the lower extremities, Dr. Odeluga noted no anatomic deformity, swelling, stiffness, effusion, skin discoloration, or increased or decreased skin temperature involving the hips, knees, and ankles. He noted full range of motion in each joint. Dr. Odeluga found full strength in all major muscle groups of both lower extremities except for the right knee flexors, which he gave a 4/5. Mr. Fain had normal knee and ankle reflexes. He had a mild antalgic gait without any assistive device. Mr. Fain had no degree of difficulty in getting on and off the exam table, tandem walking, walking on toes, walking on heels, or squatting. Dr. Odeluga's impressions were chronic bronchitis, right thigh pain, torn right hamstring muscles, and hypertension.

On February 23, 2009, Mr. Fain returned to Dr. Kay for a recheck. Mr. Fain reported that he was improving but was concerned about his ability to return to work. He also complained of increasing left foot pain due to a chronic foot deformity, for which he had seen Dr. Bruell in the past. On physical examination, Mr. Fain had improved comfort in the right hip and leg range of motion; however, there was still some limited flexion. Mr. Fain was able to bring his fingertips to within six inches of the floor with his knees extended. Dr. Kay placed him on work restrictions with no climbing, prescribed Voltren, recommended that Mr. Fain schedule a follow up with Dr. Bruell to evaluate his left foot, and directed a recheck in a month.

On February 26, 2009, Mr. Fain saw Dr. Bruell, complaining of acute onset of foot pain two months earlier. He reported that he was limping and walking on the outside of his foot and that his symptoms were aggravated by walking. Mr. Fain confirmed that he had orthotics but that he did not use them. Dr. Bruell opined that Mr. Fain had severe metatarsalgia of the left foot, status post clubfoot repair, and possible neuroma of the left forefoot. Studies of the foot ordered by Dr. Bruell revealed moderate subcutaneous edema in the plantar aspect of the forefoot at the level of the third

metatarsal head where the marker was placed, club foot deformity, fractures of the first metatarsal neck and fifth metatarsal base, mild marrow in the fourth metatarsal base related to chronic arthritis or chronic stress, and 1.1 cm soft tissue ganglion along the medial plantar proximal aspect of the first cuneiform.

On March 23, 2009, Mr. Fain was examined by Dr. Kay and reported that he was feeling better but still had some weakness. The physical exam revealed comfortable range of motion of the lumbar spine, comfortable range of motion of the hips, unremarkable straight leg raise, and non-tender hamstring. The impression was improving comfort and function following hamstring tear. Dr. Kay discontinued physical therapy and encouraged home exercises. Dr. Kay continued to impose climbing restrictions for four weeks, after which Mr. Fain was released to perform all activities.

On March 26, 2009, Dr. Bruell evaluated Mr. Fain and assessed painful chronic lateral ankle instability with pes cavus deformity of the left foot and ankle, status post clubfoot repair with severe pes cavus left foot, and marked improvement of neuroma of the left forefoot after injection. Dr. Bruell recommended, with Mr. Fain's agreement, treatment using a custom Arizona ankle foot orthosis, and the device was ordered. Dr. Bruell opined that no further treatment was required for the neuroma as the symptoms had resolved. He directed follow up in one month.

On April 9, 2009, J.V. Corcoran M.D., a non-examining State Agency physician, filled out a physical residual functional capacity assessment of Mr. Fain, listing the primary diagnosis of status post hamstring injury and a history of chronic bronchitis. He opined that Mr. Fain could occasionally lift 50 pounds and frequently lift 25 pounds, could stand or walk for a total of 6 hours in an 8 hour work day, had limitations in pushing and pulling in the lower extremities, and should avoid concentrated exposure to wetness, vibration, and hazards.

On April 23, 2009, Dr. Bruell examined Mr. Fain, and gave him the Arizona ankle foot orthosis. Dr. Bruell assessed osteoarthritis with pain of the left ankle, chronic lateral ankle instability with pes cavus deformity of the left foot and ankle, and antalgic gait. Dr. Bruell instructed Mr. Fain to begin using the orthosis gradually and to wear supportive shoes.

On December 6, 2010, a CT scan of the chest revealed a 2 cm non-calcified pulmonary nodule in the left lower lobe and a 2 cm soft tissue density in the left suprahilar region, suggestive of a lymph node. On January 18, 2011, Mr. Fain had a left lung biopsy performed. On January 31, 2011, Mr. Fain had the left upper lobe lung nodule surgically excised for biopsy.

2.    *Mental Conditions*

On July 24, 2009, William A. Shipley, Ph.D, completed a Psychiatric Review Technique form. Dr. Shipley found no medically determinable impairment, noting that Mr. Fain had coexisting non-mental impairments. Dr. Shipley also noted that Mr. Fain was the care giver for his wife as she was recovering from a stroke and that he handled multiple household chores, shopped, drove, took care of finances, and engaged in hobbies and social events with family and friends. J. Sands, M.D. affirmed Dr. Shipley's review.

On November 3, 2010, Mr. Fain sought treatment through the Veterans Administration ("VA") Medical Center and was evaluated on intake by Anastasia Mukoski, M.D. He was given an appointment with VA staff psychiatrist Daolong Zhang, M.D., a prescription for Remeron, and a reference to the mental health clinic for individual therapy that same day. He presented to Linda Sledge and Dr. Zhang as guarded, irritable, and angry. He attempted to leave the office on two occasions when discussing his alcohol use, stating that he drinks to feel normal and that what he went through in Vietnam is the issue. He admitted drinking 5 shots of vodka to be able to come to the clinic that day. He admitted to drinking 10 beers and a 1/5th of vodka a day for the past 40 years.

He reported symptoms of anxiety, poor sleep, avoidance, avoiding going out of the house, depressive mood, and nightmares. He reported that he had been treated with Paxil for depression but experienced side effects from it that caused him to stop taking it. He was diagnosed with anxiety disorder, alcohol dependence, and chronic posttraumatic stress disorder with poor social support.

On December 2, 2010, Dr. Zhang noted that Mr. Fain had been diagnosed with an anxiety disorder and was being treated with Remeron. Dr. Zhang's diagnosis was anxiety disorder, and he increased Mr. Fain's Remeron dosage.

On January 6, 2011, Mr. Fain saw Dr. Zhang, who again diagnosed anxiety disorder and continued him on Remeron. Dr. Zhang noted that Mr. Fain felt he needed more medication, felt anxious, and had been easily frustrated for months.

Yakov Gertzberg M.D., a staff psychiatrist at the VA saw Mr. Fain on March 8, 2011, and noted a history of anxiety since Mr. Fain returned from Vietnam, where he served as a marine. Mr. Fain discussed aspects of his service in Vietnam and became emotional. He noted that, since he had retired two years earlier, his mind often drifted into thoughts about past stressful events and that he worried about the future. He suffers from panic attacks more commonly when in social groups. Dr. Gertzberg opined that Mr. Fain's mood was anxious and that he had a guarded affect and was at times tearful but that he was able to regroup. Dr. Gertzberg assigned a GAF of 55.

On April 12, 2011, Dr. Gertzberg recommended an appointment with the mental health clinic, to which Mr. Fain agreed. This resulted in Mr. Fain being evaluated by Dr. Kristevski. On April 21, 2011, Mr. Fain was evaluated by Alexander Kristevski Psy.D at the VA. He told Dr. Kristevski that he was seeking mental health treatment "for his wife." (AR 510). Dr Kristevski opined that Mr. Fain was grossly oriented, his mood was anxious, and his affect was somewhat

guarded at times. Mr. Fain reported that he felt that he had a general learning disability because he could not read or write very well. Dr. Kristevski diagnosed Mr. Fain with posttraumatic stress disorder, alcohol abuse, learning disorder, and impulse control disorder.

### B. Plaintiff's Hearing Testimony

Mr. Fain is married. He has a high school education and was trained as a wireman while serving in Vietnam. He was an ironworker for 34 years and retired in November 2008.

Mr. Fain explained that his hamstring was not reattached and "hangs." (AR 48). He testified that he still had pain but that he was not being treated for it. He testified that the custom orthotics were for his broken foot, that he still wore the orthotics, but that he was not wearing them that day to the hearing. He testified that they help "somewhat" with ankle and foot pain. (AR 49).

He testified that he has trouble walking because he tires. He was not able to sit on his hamstring, which caused him to constantly make adjustments while sitting. He answered affirmatively when asked if he had problems climbing stairs, bending over, or squatting. When asked if he lies down during the day, he said he had a recliner that he sat in about an hour a day. He testified that he made sandwiches, fed the dogs, took out the garbage, and did laundry. He stopped gardening after he tore his hamstring. He testified that he spends a lot of time sitting.

Mr. Fain testified that he had been treated for posttraumatic stress disorder at the VA for about four or five months prior to the hearing. He was taking medications that caused side effects, which he described as "minor," and listed diarrhea. When asked by his attorney, he testified that an increase in one of his medications had caused him to be dizzy, and the water pill he took caused him to go to the bathroom frequently. He also had problems concentrating and did not finish tasks that

he has started. He did not like to be around crowds of people and thus did not do any shopping. He testified that he could stand for three and half hours in an 8-hour work day.

### C. VE Testimony

At the hearing, vocational expert ("VE") Richard Fisher testified that Mr. Fain's work history included industrial maintenance repairer, which was very heavy skilled work with an SVP of 8. Mr. Fisher testified that if Mr. Fain could only stand for 4 hours in a day, there would be no work available, and if he could not climb safely, there would not be jobs available. He testified that all jobs would require him to work with others. He testified that a hypothetical person who could lift and carry and push and pull up to 50 pounds occasionally and 25 pounds frequently, stand or walk for 6 hours in an 8 hour day, sit for 6 hours in an 8 hour day, occasionally use the lower right extremity for pushing and pulling, and avoid concentrated exposure to wetness, vibration, machinery, and heights would not be able to do any of Mr. Fain's past work. Mr. Fisher testified that this person could, however, do skilled jobs including building maintenance repair, which is an SVP of 7 or be an airport attendant, which is an SVP of 5. The airport job would require a 30-day learning curve. He testified that available unskilled jobs would include a motor vehicle assembler, which is medium with an SVP of 2, and warehouseman, which is medium with an SVP of 2.

### STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence

consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ "uses the correct legal standards and the decision is supported by substantial evidence." *Roddy v. Astrue,* 705 F.3d 631, 636 (7th Cir. 2013) (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010); *Prochaska v. Barnhart*, 454 F.3d 731, 734-35 (7th Cir. 2006); *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). "[I]f the Commissioner commits an error of law," the Court may reverse the decision "without regard to the volume of evidence in support of the factual findings." *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)).

At a minimum, an ALJ must articulate her analysis of the evidence in order to allow the reviewing court to trace the path of her reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). An ALJ must "'build an accurate and logical bridge from the evidence to [the] conclusion' so that, as a reviewing court, we may assess the validity of the agency's final decision and afford [a claimant] meaningful

review." *Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007) (quoting *Scott*, 297 F.3d at 595)); *see also O'Connor-Spinner*, 627 F.3d at 618 ("An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and [her] conclusions."); *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001) ("[T]he ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits.").

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that he suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To be found disabled, the claimant's impairment must not only prevent him from doing his previous work, but considering his age, education, and work experience, it must also prevent him from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. §§ 404.1520(a)(4). The steps are: (1) Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to step two; (2) Does the claimant have an impairment or combination of impairments that are severe? If not, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to step three; (3) Do(es) the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If yes, the claimant is automatically

considered disabled; if not, then the inquiry proceeds to step four; (4) Can the claimant do the claimant's past relevant work? If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to step five; (5) Can the claimant perform other work given the claimant's RFC, age, education, and experience? If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At steps four and five, the ALJ must consider an assessment of the claimant's residual functional capacity ("RFC"). The RFC "is an administrative assessment of what work-related activities an individual can perform despite [his] limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). The RFC should be based on evidence in the record. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(3)). The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ. *Zurawski*, 245 F.3d at 886; *see also Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## ANALYSIS

Mr. Fain seeks reversal and remand of the ALJ's finding of not disabled on the basis that (1) the ALJ erred in her credibility analysis by using boilerplate language, by rejecting Mrs. Fain's testimony, and by failing to consider Mr. Fain's daily activities, the side effects of his medications, and the severity of his impairments; (2) the ALJ did not consider Mr. Fain's obesity; (3) the ALJ did not provide a proper mental residual functional capacity; and (4) the ALJ improperly relied on a physical residual functional capacity assessment that does not account for all of Mr. Fain's impairments. The Commissioner responds that the ALJ's credibility and RFC determinations are supported by substantial evidence.

## A. Credibility

Once the ALJ has found an impairment that reasonably could cause the symptoms alleged, the ALJ must consider the intensity and persistence of these symptoms. 20 C.F.R. § 404.1529(a). The ALJ must consider a claimant's statements about his symptoms, such as pain, and how the claimant's symptoms affect his daily life and ability to work, although subjective allegations of disabling symptoms alone cannot support a finding of disability. *Id.* The ALJ must weigh these subjective complaints, the relevant objective medical evidence, and any other evidence of the following factors:

(1)     The individual's daily activities;
(2)     Location, duration, frequency, and intensity of pain or other symptoms;
(3)     Precipitating and aggravating factors;
(4)     Type, dosage, effectiveness, and side effects of any medication;
(5)     Treatment, other than medication, for relief of pain or other symptoms;
(6)     Other measures taken to relieve pain or other symptoms;
(7)     Other factors concerning functional limitations due to pain or other symptoms.

*See* 20 C.F.R. § 404.1529(c)(3). When evaluating the record as a whole, the ALJ also considers any statements or other information provided by treating or examining physicians and other persons about the conditions and how the conditions affect the claimant. *See* SSR 96-7p, 1996 WL 374186 (Jul. 2, 1996); *see also* § 404.1529(c)(1). "Because the ALJ is in the best position to determine a witness's truthfulness and forthrightness . . . this court will not overturn an ALJ's credibility determination unless it is 'patently wrong.'" *Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012) (internal quotation marks omitted) (quoting *Skarbek v. Barnhart*, 390 F.3d 500, 504-05 (7th Cir. 2004)); *see also Prochaska*, 454 F.3d at 738. Nevertheless, "an ALJ must adequately explain [her] credibility finding by discussing specific reasons supported by the record." *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013) (citing *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009)).

*1.     Boilerplate Language*

First, Mr. Fain argues that remand is required because the ALJ used the oft-discussed boilerplate language in her decision. *See, e.g.*, *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). However, an ALJ's use of the boilerplate language does not amount to reversible error if she "otherwise points to information that justifies [her] credibility determination." *Pepper*, 712 F.3d at 367-68. In other words, the use of the template does not warrant remand when the ALJ gives other reasons, grounded in evidence, to explain her credibility determination. *See Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012).

Mr. Fain argues that the boilerplate language was the "only discussion of Mr. Fain's credibility the ALJ provided." (Pl. Br. 15). This is incorrect; Mr. Fain ignores the ALJ's detailed analysis that follows the boilerplate language. The ALJ considered Mr. Fain's subjective statements in his application for benefits and his hearing testimony, including statements as to his symptoms and how they limited him, as well as factors that precipitated, aggravated, and/or relieved his symptoms. The ALJ performed an impairment-by-impairment analysis of the medical record, including the mostly normal to mild objective medical evidence for each impairment, the conservative treatment history for each impairment, his use of medications, including the side effects of dizziness and lightheadedness, his treatment other than medication, including physical therapy and orthotics, his activities of daily living, and Mrs. Fain's statements about his symptoms and their effect on his functioning. Thus, remand is not warranted, despite the use of the boilerplate language, because the ALJ continued with an analysis of the evidence to explain her credibility determination under the factors set out in the regulations and SSR 96-7p.

*2.     Mrs. Fain's Credibility*

Mr. Fain contends that the ALJ erred when considering the credibility of the statements his wife made in the Third-Party Adult Function Report on June 23, 2009. The regulations distinguish between opinions from "acceptable medical sources" and other health care providers who are not "acceptable medical sources." *See* 20 C.F.R. § 404.1513(a), (d)(1). In addition, the regulations provide that an ALJ may consider information from "non-medical sources," which includes spouses. *See* 20 C.F.R. § 404.1513(d)(4); *see also* SSR 06-3p, 2006 WL 2329939, at *2 (Aug. 9, 2006) (listing "other sources" as defined in § 404.1513(d) as including "spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, clergy, and employers"). Social Security Ruling 06-3p, which Mr. Fain does not discuss, clarifies how opinions from sources that are not "acceptable medical sources" are considered. *See* SSR 06-3p, at *1. In considering statements from "other sources," "the adjudicator generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." *Id*.

The ALJ followed the mandate of Ruling 06-3p by explaining that she gave "some weight" to Mrs. Fain's statements, noting that she offered insight into the severity of Mr. Fain's impairments and how they limit his functioning by indicating that Mr. Fain has difficulty preparing meals or performing housework. The ALJ gave "little weight" to Mrs. Fain's statements regarding the effect of Mr. Fain's history of torn hamstring, osteoarthritis of the right knee, and chronic left foot and ankle deformity and osteoarthritis on his ability to work because they were inconsistent with the record evidence. The request for remand on this basis is denied.

*3.      Daily Activities, Medication, and Severity of Impairment*

Finally, Mr. Fain argues that the ALJ's failure to discuss Mr. Fain's daily activities or medications requires remand. The Court disagrees. First, Mr. Fain suggests, in passing and without analysis or identification of any daily activities that are inconsistent with his RFC, that the ALJ did not discuss his activities of daily living. In fact, the ALJ noted that Mr. Fain did not always finish tasks once he started them, but could care for his grooming, make simple meals, do laundry, shop, pay bills, balance a checkbook, play cards, attend church and veterans' fundraising events and ceremonies, and perform minor household repairs. In his reply brief, Mr. Fain notes only his testimony that he does not garden anymore in relation to his physical limitations. The failure to discuss one daily activity in light of the ALJ's thorough credibility determination does not merit remand. As for his testimony that he no longer shops, which he also references for the first time in his reply brief, Mr. Fain testified that he no longer shops because he does not like to be around people, and the ALJ discussed the fact that he testified "that he is not comfortable being around other people." (AR 25). He did not testify that any physical limitation impacted his ability to shop.

Second, Mr. Fain argues that the ALJ failed to take into consideration the side effects of his medications, as required by C.F.R. § 404.1529(c)(3). Mr. Fain notes that he testified that the medications he takes have caused side effects including diarrhea, dizziness, lightheadedness, loss of balance, and frequent urination. He lists his medications as chlorthalidone, which is a water pill with side effects that include feeling weak, drowsy, restless, or light-headed, and diarrhea; mitrazapine (Remeron), an antidepressant with side effects that include headaches, trouble concentrating, memory problems, weakness, or feeling unsteady, drowsy, or dizzy; and Propranolol,

a beta-blocker used to treat hypertension with side effects of feeling light-headed, swelling of the ankles and feet, depression, confusion, nausea, vomiting, and diarrhea.

Although the ALJ did not specifically discuss the medication side effects in the context of the credibility determination, remand is not required because the ALJ considered the side effects in the decision at step three, discussed the medications in the credibility determination, and otherwise issued a strongly supported and extensive analysis of the other credibility factors. The ALJ's credibility determination was far from being "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). Also, in the ALJ's analysis of Mr. Fain's conservative treatment history in the context of the credibility determination, the ALJ discussed Mr. Fain's medications, albeit not their side effects. In addition, at step three of the sequential analysis, the ALJ discussed Mr. Fain's complaint that his medications caused dizziness and lightheadedness and contrasted this with the function report that indicated that Mr. Fain could follow written and spoken instructions "very well," pay attention "indefinitely," handle a savings account and checkbook, go shopping, and care for his pets.

Moreover, Mr. Fain does not offer any explanation of how the minimal side effects he testified to would support a finding of disability, and it is his burden to "bring to [the Agency's] attention everything that shows that [he is ] disabled." 20 C.F.R. § 404.1512(a). Mr. Fain cites no evidence that he ever complained of these side effects to his physicians. The Adult Function Reports that he cites only indicate that his medications make him lightheaded with prolonged sun exposure. At the hearing, Mr. Fain characterized his diarrhea as minor. As for the Remeron, the portion of the record cited by Mr. Fain to show the effects of Remeron on him indicates that the increased dosage of Remeron at bedtime made him feel less anxious and less frustrated but does not indicate any

18

reported side effects. As for the water pill that caused frequent urination, Mr. Fain did not testify how often it caused him to go to the bathroom, he cites no evidence that he complained to a physician about this side effect, and he does not explain what additional limitations should have been imposed to accommodate the side effect. Finally, Mr. Fain does not acknowledge that the ALJ added restrictions to his RFC that he must avoid concentrated exposure to wetness, machinery, hazards, and heights.

Third, in one sentence, Mr. Fain criticizes: "The ALJ finds the evidence 'reveals only minimal to mild osteoarthritis of the right knee,' suggesting the symptoms were not as severe as Mr. Fain has alleged." (Pl. Br. 14 (citing AR 29)). But Mr. Fain fails to recognize the additional rationale provided by the ALJ. On the previous page, the ALJ recited the objective x-ray evidence that revealed degenerative osteoarthritic changes involving the knee joint, and then noted that Mr. Fain did not seek treatment for his knee after that date. In the same vein, the Court notes that the x-ray was taken during Mr. Fain's treatment in the emergency room in November 2008 for his leg injury that occurred when he tried to stop a rolling truck and not in the course of treatment for complaints of chronic knee pain.

Mr. Fain also contends that the ALJ wrongly found his symptoms not as severe as alleged when the ALJ went on to note that "the claimant was diagnosed with severe metatarsalgia of the left foot, post club foot repair and possible neuroma of the left forefoot." (Pl. Br. 15 (citing AR 28)). Mr. Fain also identifies the objective evidence of his foot impairment. However, Mr. Fain again ignores the detailed analysis of the record evidence by the ALJ in support of the credibility and RFC findings, including that Mr. Fain received a limited amount of conservative treatment for his torn right hamstring and responded well to physical therapy; his positive response to the left shoe orthotic

for his left ankle instability and antalgic gait; the minimal to mild evidence of osteoarthritis in his right knee; the essentially normal results from the March 2009 consultative exam; the lack of any significant reported abnormalities in the treatment notes of his treating physician; and the medical opinions of Dr. Corcoran and Dr. Sands. Moreover, the ALJ recognized that Mr. Fain experienced some pain and symptoms. Finally, Mr. Fain does not identify any evidence allegedly overlooked by the ALJ that would support a finding of disability.

## B. Obesity

Mr. Fain weighed 236 pounds and had a body mass index ("BMI") of 31.1 on December 6, 2010. On January 31, 2011, Dr. Walid Khabbaz noted that Mr. Fain's abdomen appeared moderately obese. The ALJ did not discuss Mr. Fain's obesity in her decision, and Mr. Fain argues that remand is mandated on this basis. Mr. Fain notes that he has been diagnosed with osteoarthritis, is on medication for high blood pressure, and suffers from a foot deformity. Mr. Fain argues that the ALJ's failure to account for his obesity when determining that he could lift and carry 50 pounds and stand and walk for 6 hours in an 8-hour work day is reversible error.

A BMI of greater than 30 is considered obese. SSR 02-1p, 2002 WL 34686281 (Sept. 12, 2002). Under Social Security Ruling 02-1p, an ALJ must specifically address the effect of obesity on a claimant's limitations. *See* SSR 02-1p, at *1. Obesity often leads to complications of the cardiovascular, respiratory, and musculoskeletal body systems and may contribute to loss of mental clarity, as well as slowed reactions caused by obesity related sleep apnea. *Id*. at *3. However, failure by the ALJ to explicitly discuss a claimant's obesity is harmless error if the ALJ's decision was predicated on medical opinions that discuss claimant's weight. *Arnett v. Astrue*, 676 F.3d 586, 593 (7th Cir. 2012); *Prochaska*, 454 F.3d at 736-37.

Medical evidence throughout the record documents Mr. Fain's obesity or weight, and the medical sources who provided RFC opinions, Dr. Corcoran and Dr. Sands, indicated that they reviewed Mr. Fain's records. They opined that Mr. Fain could perform a restricted range of medium work. No medical source opined that Mr. Fain had any limitations from his obesity or that his obesity aggravated his other impairments. Thus, in assessing Mr. Fain's RFC, the ALJ considered the opinions and findings of physicians who discussed Mr. Fain's obesity, satisfying the requirement that the ALJ consider Mr. Fain's obesity as supported in the record. *See Skarbek*, 390 F.3d at 504 ("[T]he ALJ adopted the limitations suggested by the specialists and reviewing doctors, who were aware of Skarbek's obesity. Thus, although the ALJ did not explicitly consider Skarbek's obesity, it was factored indirectly into the ALJ's decision as part of the doctors' opinions.").

Like the plaintiff in *Skarbek*, Mr. Fain's BMI of 31.1 placed him in the lowest level of obesity recognized by the Social Security Administration, Level 1. *See Bellmore v. Astrue*, 4:08cv94, 2010 WL 1266494, at *7 (N.D. Ind. Mar. 25, 2010) (contrasting the morbidly obese plaintiff in that case with the plaintiff in *Skarbek*). Mr. Fain offers no evidence and cites no testimony suggesting that his obesity, either alone or in combination with other medically determinable impairments, in fact significantly limits his ability to do basic work activities. Thus, even if the Court were to remand for a more thorough discussion of Mr. Fain's mild obesity, the outcome of the case would not be affected. *See Skarbek*, 390 F.3d at 504 (citing *Keys v. Barnhart, 347 F.3d 990, 994-95 (7th Cir. 2003)); *Outlaw v. Astrue*, 412 F. App'x 894, 898 (7th Cir. 2011).

## C. Mental RFC

Mr. Fain argues that the ALJ improperly determined at step two of the sequential analysis that he did not have a severe mental impairment. An impairment is severe if it has more than a

minimal effect on the ability to perform basic work activities. *See* 20 C.F.R. §§ 404.14520a(d)(1); 404.1521. On July 24, 2009, Dr. Shipley, the state agency doctor, completed a Psychiatric Review Technique form and opined that Mr. Fain had no medically determinable impairment. However, the ALJ gave little weight to Dr. Shipley's opinion because "[u]pdated psychiatric records from the VA Hospital indicate that the claimant has received a minimal amount of treatment for anxiety disorder and posttraumatic stress disorder." (AR 26). Applying the "special technique" for mental impairments, the ALJ found that Mr. Fain's mental impairments of anxiety disorder and posttraumatic stress disorder were medically determinable impairments but found them to be non-severe because they "do not cause more than minimal limitations in the claimant's ability to perform basic mental work activities." (AR 25).

Mr. Fain contends in his brief that the ALJ provided no further discussion as to how she arrived at this conclusion. He also argues that the ALJ should have obtained an updated mental RFC because Dr. Shipley's assessment, to which the ALJ gave little weight, was made two years before Mr. Fain's diagnosis at the VA. First, the ALJ was not required to rely entirely on a particular physician's opinion or choose between the opinions of Mr. Fain's physicians in assessing his mental impairments. *See Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007); *see also Richards v. Astrue*, 370 F. App'x 727, 731 (7th Cir. 2010) (citing 20 C.F.R. § 404.1520a(e)(3) (providing that ALJ *may* consult medical expert or remand to state agency *if* unable to apply special technique on her own). The ALJ must give consideration to the opinions of medical sources in evaluating whether a claimant is disabled; however, the final responsibility for deciding a plaintiff's specific work-related limitations is reserved to the Agency. *See* 20 C.F.R. § 404.1527(e)(2); *Diaz*, 55 F.3d at 306, n.2.

Mr. Fain's argument is curious because he recognizes that the ALJ gave little weight to the outdated assessment of Dr. Shipley in favor of considering the more recent records from the VA hospital that indicated that Mr. Fain had been subsequently diagnosed with anxiety disorder and post-traumatic stress disorder. However, Mr. Fain fails to recognize that the ALJ went on to remark that Mr. Fain received a minimal amount of treatment for these impairments. This analysis supported the ALJ's conclusion that his medically determinable mental impairments did not cause more than minimal limitations in his ability to perform basic mental work activities.

Finally, Mr. Fain completely ignores, and thereby does not dispute, the ALJ's detailed findings under the "special technique" with respect to the paragraph "B" criteria of Listing 12.00C. The ALJ considered each of the three functional areas under paragraph "B" of Listing 12.00C and found that Mr. Fain had mild limitations of activities of daily living and concentration, persistence, or pace and no limitations in social functioning. In making her findings, she extensively cited the record. Again, Mr. Fain does not dispute these findings. Substantial evidence supports the ALJ's step two finding that Mr. Fain does not have a severe mental impairment.

### D. Physical RFC

Mr. Fain argues that the ALJ improperly relied on the April 9, 2009 physical RFC assessment of Dr. Corcoran that found Mr. Fain capable of performing medium work because Dr. Corcoran did not mention Mr. Fain's right knee, his obesity, or his left foot deformity. The RFC, which is at issue at steps four and five of the sequential evaluation, is a measure of what an individual can do despite the limitations imposed by her impairments. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004); 20 C.F.R. § 404.1545(a)(1); SSR 96-8p, 1996 WL 374184, *3 (July 2, 1996). The determination of a claimant's RFC is a legal decision rather than a medical one. 20

C.F.R. § 404.1527(e)(2)); *Diaz*, 55 F.3d at 306 n.2. The evidence relevant to the RFC determination includes medical history; medical signs and laboratory findings; the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations, if available. SSR 96-8p, at *5. The ALJ "must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." *Id*. In addition, the ALJ "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe'" because they "may–when considered with limitations or restrictions due to other impairments–be critical to the outcome of a claim." *Id*.

To support his argument that the ALJ should not have relied on Dr. Corcoran's assessment, Mr. Fain notes that Dr. Corcoran could not have considered the finding of the nodule in the left lower lobe of his lung because it was found after the assessment and argues that Dr. Corcoran did not consider the combination of all his impairments in the aggregate. However, in formulating her RFC, in addition to considering Dr. Corcoran's opinion, the ALJ provided a detailed narrative discussion of the medical and nonmedical evidence and assessed Mr. Fain's abilities in accordance with 20 C.F.R. § 404.1545 and SSR 96-8p. A review of that discussion demonstrates that the ALJ discussed all of Mr. Fain's limitations. As for Dr. Corcoran's opinion, she gave it "considerable weight as it [is] consistent with the record as a whole, which indicates that the claimant's torn right hamstring limits the use of his right lower extremity and causes him to walk with a slightly antalgic gait." (AR 29).

The ALJ also considered Mr. Fain's conservative treatment history and positive response to treatment for each of his physical impairments. She noted that Mr. Fain responded well to physical

therapy for his right hamstring pull and generally saw his primary doctor only for follow-up appointments for hypertension. The ALJ further noted that Mr. Fain's primary care physician found that his hypertension was well-controlled and repeatedly reported essentially normal physical examinations. The ALJ considered the essentially normal consultative physical examination. As for the treatment of Mr. Fain's foot pain, the ALJ noted the conservative treatment history for several diagnoses regarding the foot and considered that Mr. Fain's gait was more stable and his left foot less painful when he wore the custom orthotic. The ALJ recognized that Mr. Fain sought no further treatment for his left foot after the November 2010 x-ray was essentially normal. As noted above, the ALJ properly noted that Mr. Fain received no treatment for his right knee after the November 2008 x-ray. In addition and as discussed above, the ALJ considered Mr. Fain's testimony, the testimony of Mrs. Fain, the opinion of the record medical sources (none of whom opined that Mr. Fain was disabled or had disabling limitations), and his activities of daily living.

To the extent Mr. Fain argues that Dr. Corcoran did not consider his right knee or left foot impairments, both Dr. Corcoran and Dr. Sands indicated that they reviewed Mr. Fain's file before reaching their opinions. And again, the final responsibility for deciding a plaintiff's specific RFC is an administrative determination reserved for the Agency. *See* 20 C.F.R. § 404.1527(e)(2); *Diaz*, 55 F.3d at 306, n.2.

Finally, Mr. Fain references the evidence of a nodule and a lymph node in his left lung as well as a large amount of degenerative changes in his thoracic spine that were shown on CT scans and other images taken of Mr. Fain's lungs in December 2010, after Dr. Corcoran's opinion. However, Mr. Fain ignores the fact that no medical source reported or defined what the thoracic changes were, diagnosed any thoracic impairments related to these changes, prescribed any

medication or other treatment for these changes, or assessed any limitations related to the thoracic changes that were noted in passing on the image taken to evaluate Mr. Fain's lungs. As for his left lung, Mr. Fain ignores the ALJ's specific finding that the left lung mass was not "severe" because a biopsy and other tests performed in January 2011 "failed to detect any malignant tissue." (AR 24).

Accordingly, the ALJ's RFC finding considered Mr. Fain's impairments in combination as part of the detailed narrative discussion of the medical and nonmedical evidence of record. The ALJ's RFC finding is supported by substantial evidence and does not contain errors of law.

## CONCLUSION

Based on the foregoing, the Court hereby **DENIES** the relief sought in Plaintiff's Brief in Support of Reversal of Commissioner's Final Decision [DE 15], and **AFFIRMS** the Commissioner of Social Security's final decision.


So ORDERED this 26th day of March, 2014.

s/ Paul R. Cherry_____
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record